IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| (1) TransCapital Leasing Associates 1994-I L.P., a Delaware limited partnership, (2) Plains Capital Corporation, a Texas corporation and its subsidiaries including (3) PlainsCapital Bank, a Texas banking association, f/k/a Plains National Bank, and (4) Plains Financial Corporation, a Texas corporation, A PARTNER OTHER THAN THE TAX MATTERS PARTNER, | § | No. 06-24-T<br>Judge Marian Blank Horn |
| Plaintiffs, | § | |
| v. | § | |
| United States of America, | § | |
| Defendant. | § | |

**MOTION OF UNITED STATES FOR LEAVE TO ENLARGE THE NUMBER OF ALLOWABLE FACT DISCOVERY DEPOSITIONS AND EXTEND THE DISCOVERY DEADLINE**

WAYMON G. DuBOSE, JR.
Attorney of record
Tax Division
U. S. Department of Justice
717 N. Harwood, Suite 400
Dallas, Texas 75201
(214) 880-9721 (Main)
(214) 880-9741 (facsimile)

EILEEN J. O'CONNOR
Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims
JON E. FISHER
DAVID B. COFFIN
DAVID R. HOUSE
Of Counsel

# TABLE OF CONTENTS

Page(s):


Introduction . . . . . 1

Background . . . . . 2

I. The Leasehold Positions Transactions and Plaintiffs' Claimed Tax Benefits . . . 2

II. The Discovery Completed to Date . . . . . 5

Argument . . . . . 9

I. The Presumptive Limit of Ten Depositions in RCFC 30 . . . . . 9

II. The Requirements of RCFC 26(b)(2) Are Satisfied Here . . . . . 12

A. The Testimony the United States Seeks Is Not Unreasonably Cumulative or Duplicative, or Obtainable from Another Source . . . . . . 12

B. The United States Has Not Yet Held an Opportunity to Discover the Information Sought . . . . . 14

C. The Importance of the Issues, Needs of this Case, the Amount in Controversy and the Importance of the Discovery Outweigh Any Possible Burden . . . . . 16

III. The Discovery Schedule Should Be Extended . . . . . 17

Conclusion . . . . . 20

# TABLE OF AUTHORITIES

**FEDERAL CASES:**

*Archer Daniels Midland Co. v. Aon Risk Services, Inc. of Minnesota*,
187 F. R. D. 578, 586 (D. Minn.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*CMA Consolidated, Inc. v. Commissioner*, T.C.M. (RIA) ¶ 2005-16 at 100 . . . . . . . . . . . . . . . . 2

*Coltec Industries Inc. v. United States*, 454 F.3d 1340 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . 12

*Gregory v. Helvering* 293 U.S. 465 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Munoz v. Orr*, 200 F.3d 291, 305 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*TIFD III-E v. United States*, 459 F.3d 220 (2nd Cir. 1006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Turner v. Shoney's, Inc.*, 195 F.R.D. 637 (S.D. Ind. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*TransCapital Leasing Associates 1990-II L.P. v. United States*,
2006 WL 897723 (W. D. Texas March 31, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 13

*TransCapital Leasing Associates 1992-VIII, L.P. v. United States of America*,
Civil No. 5:03cv0024 (DC ED Texas-Texarkana) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**STATUTUES & REGULATIONS:**

I. R. C.
§ 351 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
§ 708(b)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Treas. Reg. (26 C.F.R.):
§ 1.708-1 (amended effective May 8, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**MISCELLANEOUS:**

Rules of the Court of Federal Claims
R. 26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
R. 26(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
R. 26(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
R. 30(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
R. 30(a)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5, 9

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| (1) TransCapital Leasing Associates 1994-I L.P., a Delaware limited partnership, (2) Plains Capital Corporation, a Texas corporation and its subsidiaries including (3) PlainsCapital Bank, a Texas banking association, f/k/a Plains National Bank, and (4) Plains Financial Corporation, a Texas corporation, A PARTNER OTHER THAN THE TAX MATTERS PARTNER, | § | No. 06-24-T<br>Judge Marian Blank Horn |
| Plaintiffs, | § | |
| v. | § | |
| United States of America, | § | |
| Defendant. | § | |

**MOTION OF UNITED STATES FOR LEAVE TO ENLARGE THE NUMBER OF ALLOWABLE FACT DISCOVERY DEPOSITIONS AND EXTEND THE DISCOVERY DEADLINE**

**Introduction**

This case concerns a tax shelter – i.e., a "lease strip" shelter – developed, designed and promoted principally by Transcapital Corporation in 1994. Plaintiffs purchased this shelter at a cost of $1.1 million and claimed $11 million of tax deductions in years 1994 through 2000.

To defend against plaintiffs' claims, and develop a record of admissible evidence to prove that plaintiffs are not entitled to the artificial tax benefits they seek, the United States needs to obtain discovery from the various entities and individuals who developed the shelter and designed, developed, promoted, and participated in the transactions upon which plaintiffs rely. For example, the United States must be given the opportunity to discover evidence to show that the transactions plaintiffs engaged in were not, as plaintiffs allege, an investment with

economic substance and a business purpose, but were, instead, undertaken pursuant to a prepackaged, tax shelter strategy, wholly lacking in economic substance. Because of the number of individuals who were *directly* involved in designing and developing the tax shelter and who *directly* participated in the transactions at issue here, the United States cannot obtain this necessary discovery within the presumptive ten deposition limit of RCFC 30(a)(2)(A). Accordingly, the United States requests that the Court issue an order allowing it to take an additional twelve depositions.

## Background

### I. THE LEASEHOLD POSITIONS TRANSACTIONS AND PLAINTIFFS' CLAIMED TAX BENEFITS

In 1994, Transcapital Corporation, a Delaware corporation with offices located in Connecticut and Virginia, through it subsidiaries and related entities also located in Virginia, promoted and marketed highly-complex "leasehold positions" transactions[1] involving computer equipment to Plains Capital Corporation and its subsidiaries PlainsCapital Bank, f/k/a Plains National Bank, and Plains Financial Corporation. The shelter purchased by plaintiffs involved a number of preplanned paper transactions[2] designed to unnecessarily complicate and obfuscate the underlying facts, including (i) the creation of TransCapital Leasing Associates 1994-I L.P.

---

[1] A Tax Court case involving similar facts described its transactions as a "Byzantine labyrinth of complex transactions. . . . generated to achieve a tax effect." *See CMA Consolidated, Inc. v. Commissioner*, T.C.M. (RIA) ¶ 2005-16 at 100. *CMA Consolidated* actually involved the same tax neutral entity, the Iowa Tribe of Oklahoma, that is involved in this case. The identical structure of the transaction in this case, involving the same promoter and accommodating parties, was more recently tested and rejected in *TransCapital Leasing Associates 1990-II L.P. v. United States*, 2006 WL 897723 (W. D. Texas March 31, 2006).

[2] These transactions were purportedly entered into within 15 days.

(TCLA 1994-I), a Delaware limited partnership, (ii) the purported multiple sales and leasebacks of computer equipment on the same day that TCLA 1994-I was formed, (iii) the purported sale of the underlying lease rents by TCLA 1994-I to a purported lease factoring company, Aardan Leasing Corporation, and (iv) a purported transfer under I. R. C. § 351 by TransCapital Leasing Associates 1992-IX Limited Partnership (TCLA 1992-IX) of its 99% limited partnership interest in TCLA 1994-I to Plains Financial Corporation in exchange for stock of Plains Financial Corporation.

TransCapital Management Associates Limited Partnership XII (TMALP XII) was TCLA 1994-I's 1% general partner and TCLA 1992-IX was TCLA 1994-I's 99% limited partner. The 99% limited partner of TCLA 1992-IX was Okoma Enterprises, L.P. Okoma's 99% limited partner was the Iowa Tribe of Oklahoma. The purported transfer was intended to qualify as a § 351 transaction which would allow Plains Financial Corporation to take a transferred basis in the TCLA 1994-I interest. The contribution resulted in a § 708(b)(1)(B) termination of TCLA 1994-I.[3] The taxable year of the TCLA 1994-I ended on the date of the termination under § 708(b)(1)(B) and the income from the sale of the rent stream was allocated to the pre-termination partners. This resulted in the income from the sale of the rent stream being allocated 99% to TCLA 1992-IX and 1% to TMALP XII. The income from TCLA 1992-IX was then

[3] Treas. Reg. § 1.708-1 was amended effective May 8, 1997. On the date of this termination, the prior regulations applied and TCLA 1994-I was deemed to distribute its assets and liabilities to TMALP XII and Plains Financial Corporation in proportion to their respective interests in the partnership properties; and, immediately thereafter, TMALP XII and Plains Financial Corporation are deemed to contribute the properties to new TCLA 1994-I, either for the continuation of the business or for its dissolution and winding up.

allocated 99% to Okoma. Okoma allocated 99% of the income to the Iowa Tribe of Oklahoma, which is not subject to U.S. income tax.

As a result of these alleged transactions, $11 million of paper income was "stripped off" and ultimately allocated to a tax exempt Indian tribe, permanently escaping taxation, and plaintiffs, on their consolidated federal income tax returns for years 1994 through 2000, claimed more than $11 million of tax deductions. These deductions generated a total tax savings for plaintiffs of more than $3 million.

To support their claims, plaintiffs made several factual claims in the Petition, including the following:

- the Partnership (TCLA 1994-I) invested in the computer equipment in order to make a pre-tax profit;
- the Partnership (TCLA 1994-I) acquired all of its interests in the computer equipment in arms-length transactions with unrelated persons;
- the Partnership (TCLA 1994-I) and its partners conducted due diligence concerning the computer equipment and the anticipated economic return under the leases before entering into the leasing activities that are the subject of the FPAAs;
- the Partnership's (TCLA 1994-I) leasing activities had economic substance, were not prearranged or predetermined, had legitimate business purposes, were not a sham, and had significant profit motive;
- the Partnership's (TCLA 1994-I) transaction on September 20, 1994, in which the Partnership sold to Aardan its right to receive the underlying lease rents was in substance a sale.

For purposes of testing these factual allegations, plaintiffs would evidently like to limit the United States' scope of discovery to only deposing eight[4] of the 17 fact witnesses it has identified as having information helpful to it, and to reviewing the documents that Transcapital Corporation, the promoter, and plaintiffs, created to "paper" the shelter.[5] The United States' discovery should not be so limited under RCFC 26. To the contrary, the United States is entitled to seek information and evidence from plaintiffs and the third-parties that *directly* participated in developing and executing the transactions, and who have *personal knowledge* of the facts at issue.

## II. <u>THE DISCOVERY COMPLETED TO DATE</u>

Substantial document discovery has been completed to date. The parties have exchanged interrogatories and requests for production of documents. The United States has also sent document subpoenas to numerous third-parties.[6] The United States has also taken four depositions[7]: Eric Lund,[8] former marketing representative of Transcapital Corporation; Michael

---

[4] Plaintiffs have designated two expert witnesses, which the United States will also need to depose.

[5] Plaintiffs have refused to agree that the United States can take more than the ten depositions provided for in the presumptive rule of RCFC 30(a)(2)(A). In its RCFC 26(a) disclosures alone, plaintiffs identified more than ten individuals that have information that *they* may use to support their claims.

[6] These third-parties did not produce the documents for approximately two months.

[7] These depositions were taken on April 4, 6, 13, and 20, 2007. Two were in Texas, one was in Virginia, and one was in New York.

[8] Plaintiffs have agreed to reconvening of Mr. Lund's deposition, which was commenced on April 4, 2007. His deposition was adjourned by agreement at his request because of personal reasons.

Hester, former Vice President and Treasurer of Transcapital; Donald G. Butler, Executive Vice-President of Transcapital Corporation and Transcapital Management Corporation; and Jeff Isom,[9] Secretary/Treasurer of Plains Financial Corporation, and Senior Vice President and Controller of Plains National Bank. The United States has this week, by agreement, scheduled two more depositions: Joel Mallin, President of Equilease Corporation and Equitable Leasing Company, Inc.; and Joel Klein, Vice-President of Mithril Corporation, General Partner of Capital Asset Partners, and General Partner of Stamford Leasing Associates.

Documents obtained over the past few months from third parties and deposition testimony suggest that plaintiffs' claims are not true, and that plaintiffs are not entitled to the permanent tax losses they seek to deduct in years 1994 through 2000. For example, attached as Exhibit A, is a copy of an October 7, 1994 facsimile, with attachments, from Retta Smith of Transcapital Corporation to Charlie Matthews, Transcapital's outside counsel. This document contains comments by Jay Zukerman, Transcapital's general counsel, that Frank Kennedy's change to the Remarketing Agreement between Transcapital Computer Corporation and Old Colony Group, Inc. concerning the Bull computer equipment was unacceptable. This document appears to indicate that the Remarketing Agreement, which was dated as of September 15, 1994, was still being negotiated after the purported September 30, 1994, closing date. Attached as Exhibit B is a copy of a Bill of Sale between Peripheral Remarketing, Inc. and Partners Capital

[9] The United States learned in Jeff Isom's deposition of two additional witnesses that plaintiffs had not previously disclosed. They were Alan White, Chairman of the Board of Plains National Bank, and John Owens, President and Chief Financial Officer of Plains National Bank. Alan White and John Owens attended, along with six other representatives of the Bank, a key meeting on August 25, 1994, in which Eric Lund, Transcapital Corporation's marketing representative, made a presentation about the generic "leasehold positions" transactions that Transcapital was promoting.

Group dated as of December 30, 1992, apparently showing that the Unisys computer equipment at issue was purchased for $50,000. According to attached Exhibit B-1, this appears be the same Unisys equipment valued by Ralph Page of Marshall & Stevens two years later in September 1994, coinciding with the date of the transaction at issue, at $4.2 million. According to attached Exhibit C, the Bull equipment at issue was valued by Ralph Page of Marshall & Stevens in September 1994, coinciding with the date of the transaction at issue, at $6.2 million. According to attached Exhibit D, the same Bull equipment was valued by Ralph Page of Marshall & Stevens in September 1996 at only $400,000. The later document appears to show the Bull equipment dropped in value in a two year period by $5.8 million. Plaintiffs' claims rest on supposed higher values in the computer equipment, yet the significant variations in value cannot be explained.

Also attached as Exhibit E is a Source & Use of Funds[10] for the leasehold positions transaction produced by Transcapital Corporation. This document shows that the sale price of the $9,894,070 of leasehold positions to plaintiffs was $1,187,218. It also shows Transcapital Corporation apparently used a portion of the sale price to plaintiffs to pay an "FOL cost" of $325,000 to Old Colony Group and $200,715 to "Equilease (BC/BS)." Equilease Corporation appears to own and control Mithril Corporation. Mithril purportedly purchased the Bull equipment from TCLA 1994-I for a sale price of $500,000 more than TCLA 1994-I purportedly purchased the equipment from Transcapital Computer Corporation, a subsidiary of Transcapital

[10] Michael Hester, former Vice President and Treasurer of Transcapital Corporation, testified on deposition that he prepared this document.

Corporation, on the same day, September 15, 1994. Once again, the increased purchase price to Mithril remains unexplained.

Attached as Exhibit F is a memorandum from Jay Zukerman (Vice-President and General Counsel of Transcapital Corporation) to Cathie Magee, with a copy to Michael Hester, regarding remarketing and revenue sharing on the Plains National Bank transaction with numerous entities. Also attached as Exhibit G is a memorandum from Jay Zukerman to Joel Klein[11] and Michael Hester regarding the cash flow on the Plains transaction. This document appears to show a list of checks and wires to be made for the Plains National Bank transaction to approximately 13 different entities. However, the revenue sharing agreements and the reasons and dates of the payments are relevant because, for example, it appears that funds paid by Transcapital Corporation to First Florida Leasing ($631,305) were then paid to accommodating party Equilease and related entities in exchange for providing the Unisys computer equipment on lease to Blue Cross Blue Shield of North Dakota, the equipment purchaser, Mithril, and the income absorbing entity, the Iowa Tribe.

Also attached as Exhibit H are copies of a Forecast of Investor Benefits and a Forecast of Tax and Economic Consequences that were included in Transcapital Corporation's final (confidential) proposal, dated September 15, 1994, to Plains National Bank for an investment in a partnership containing $9,894,070 of leasehold positions. These documents show that *assuming no cash flow* from the leasehold renewals of the computer equipment, Plains National Bank's cash investment of $1,187,218 will provide it with $11,081,288 of permanent tax losses

---

[11] Mr. Klein was Vice-President of Mithril Corporation, General Partner of Capital Asset Partners, and General Partner of Stamford Leasing Associates. His deposition is scheduled for May 14, 2007, in New York city.

(a 9 to 1 tax write off) in years 1994 through 2000 and more than $3,700,000 in tax savings. This is relevant because it highlights the shelter transaction's significant tax benefits to plaintiffs even if no renewal proceeds are received.

These are just a few examples of the subjects and documents about which the United States now seeks, and should be allowed to obtain, testimony. The United States' current list of potential witnesses, with a summary of the subjects about which it believes they have information, is attached as Exhibit I. Only by having the opportunity to depose the remaining witnesses can the United States develop the testimony necessary to explain the documents, fill in the gaps left by the documents, and obtain testimony about other matters, and then efficiently and effectively present its defenses at trial.[12]

## Argument

### I. THE PRESUMPTIVE LIMIT OF TEN DEPOSITIONS IN RCFC 30

Rule 30(a)(2)(A) of the Rules of the Court of Federal Claims, like its counterpart in the Federal Rules of Civil Procedure, presumptively limits the number of depositions any party can take to ten. The Court is given discretion, however, to adjust this general rule, and enlarge the number of depositions to accommodate the needs of any particular case. *See*, RCFC 30(a)(2). The principles of RCFC 26(b)(2) are applicable to the exercise of this discretion. *Id.* The relevant factors are (i) whether the discovery is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) whether the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; and (iii) whether the burden or expense of the proposed discovery

[12] All of these potential witnesses have been previously disclosed to plaintiffs.

outweighs the likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues. *See* RCFC 26(b)(2).

At the outset, it should be noted that Plains National Bank itself represented to the Office of the Comptroller of the Currency in a letter dated September 6, 1994, that the equipment leasing transaction with TransCapital Corporation was "...part of a series of complex transactions involving 'wrap' leases, " according to Exhibit J attached hereto. Indeed, the "complexity" of the shelter seems to have been intentional, as these complex transactions involve more than 30 different entities.[13] Also attached hereto as Exhibit K is a summary of the transaction and flow charts, which Mr. Isom testified on deposition was provided to Plains National Bank. Michael Hester testified on deposition that the handwritten draft of this document was prepared by Jay Zukerman. This document appears to attempt to make these complex transactions understandable for purposes of promoting the shelter. However, a number of transactions (*see e.g.* Petition ¶¶ 46-59) and parties involved (*see e.g.* TCLA 1992-IX's 99% limited partner, Okoma Enterprises, L.P., and its 99% limited partner, the Iowa Tribe of Oklahoma) appear to the have been intentionally omitted. The United States' review of other

---

[13]The entities include: Sun Life Insurance Company of America; Marine Bank of Springfield; Carolina Freight Carriers Corporation; Blue Cross Blue Shield of North Dakota; IFC, Inc.; Equitable Leasing Company, Inc.; Partners Capital Group; Capital Asset Partners; Peripheral Remarketing, Inc.; Stamford Leasing Associates; Old Colony Group, Inc.; Marshall & Stevens, Inc.; Transcapital Corporation; Transcapital Computer Corporation; Transcapital Management Corporation; TAC I, Inc.; TCLA 1994-I; TCLA 1992-IX; TMALP XII; Aardan Leasing Corporation; First Florida Leasing Corporation; Mithril Corporation; Equilease Corporation; MBP Administration, Inc.; KPMG Peat Marwick; Okoma Enterprises, L.P.; the Iowa Tribe of Oklahoma; Haight, Tramonte, Siciliano & Flask Haight, P.C.; Plains Capital Corporation; Plains National Bank; Plains Financial Corporation; and Robinson, Burdette, Martin & Cowan LLP.

documents produced by plaintiffs and third parties confirm that this was a complicated process, and that many different people had separate and distinct roles in developing, designing, and implementing the shelter transaction at issue in this case. More than 30 entities are involved in these transactions and thus at least 30 individuals have material knowledge of the various aspects of the transactions. One witness may have knowledge or recall certain information and another witness may not. The United States, from experience in similar cases, has found many deponents typically have vague or selective memories, frequently saying "I don't recall" or "I don't remember." It is impossible for the United States to know the scope or breadth of a witness's knowledge or recall of the facts without taking a deposition. Likewise, it is impossible for the United States to know the financial interests of the numerous entities without deposing their shareholders, officers, employees, partners or other representatives. Given the numerous entities and individuals involved, it is unreasonable and unfair for the Court to limit the United States, which is a stranger to the transactions in this case, to eight depositions.

Because there were so many different people with responsibility for many discrete aspects of the development or implementation of the shelter transaction, we have identified – and seek to take discovery from – the witnesses listed in Exhibit I. Although each person may only be able to offer testimony about a small aspect of the transactions, the testimony of each person is crucial to enable the United States and the Court to obtain and understand a complete picture of the shelter and its transactions.[14] In sum, this is clearly not a case to which the general rule of only ten depositions applies.

---

[14] Of course, if just a few individuals can provide enough testimony to complete the record, other witnesses will not need to be deposed. The United States will not know this, however, until it deposes the witnesses.

## II. THE REQUIREMENTS OF RCFC 26(b)(2) ARE SATISFIED HERE

### A. The Testimony the United States Seeks Is Not Unreasonably Cumulative or Duplicative, or Obtainable from Another Source

The testimony that the United States seeks from the witnesses identified on Exhibit I is clearly relevant to the fundamental issues in this case, including whether the shelter and its transactions were economic shams, and did not have any economic substance and business purpose. The economic substance doctrine is an objective test, under which the actual substance of the transaction – not its mere form – controls for tax purposes. *See, e.g., Coltec Industries Inc. v. United States*, 454 F.3d 1340 (Fed. Cir. 2006); *Gregory v. Helvering* 293 U.S. 465 (1935) and *TIFD III-E v. United States*, 459 F.3d 220 (2nd Cir. 1006). Discovery from the entities and individuals who actually designed, developed and participated in the leasehold positions transactions in this case, will allow the United States, and this Court, to see what happened behind the paper form of the transactions, and understand their true substance. Several of the individuals listed in Exhibit I – including Joseph F. Campagna, Jay Zukerman, Jon T. Flask and others – may be able to provide information, for example, as to why the transactions here were structured as they were and as to the financial interests of the numerous entities involved.

The testimony of these participants is also relevant to whether the transactions went beyond being economic shams and were also factual shams. That is, the other participants in these transactions may be able to testify as to whether the transactions actually took place as represented in the documents, or not. As noted above, some records produced by TransCapital Corporation appear to indicate that the transactions did not occur as represented on paper.

Finally, plaintiffs have alleged in this case that they relied on a September 30, 1994, tax opinion letter issued to Plains National Bank by Haight, Tramonte, Siciliano & Flask in deciding to acquire the limited partnership interest in TCLA 1994-I from TCLA 1992-IX. However, this opinion, according to Exhibit L was not received by Plains National Bank from TransCapital Corporation until, at the earliest, November 15, 1994, approximately 45 days after the purported September 30, 1994, transaction closing date. Moreover, according to Exhibit M attached hereto, the tax opinion was prepared by the law firm that represented TransCapital Corporation – the promoter of the shelter – which also paid for the opinion.

It is well settled that courts have broad discretion in matters relating to discovery. *See Munoz v. Orr*, 200 F.3d 291, 305 (5th Cir. 2000). A party seeking leave must set forth a "particularized showing" of need. *See, e.g. Archer Daniels Midland Co. v. Aon Risk Services, Inc. of Minnesota*, 187 F. R. D. 578, 586 (D. Minn.1999). Denial of expansion of discovery, if required for fair adjudication, can be error. *See Turner v. Shoney's, Inc.*, 195 F.R.D. 637 (S.D. Ind. 1999).

In two similar tax shelter cases, *TransCapital Leasing Associates 1990-II L.P. v. United States*, 2006 WL 897723 (W. D. Texas March 31, 2006), which is on appeal to the Fifth Circuit, and *TransCapital Leasing Associates 1992-VIII, L.P. v. United States of America*, Civil No. 5:03cv0024 (DC ED Texas-Texarkana), which has been settled, the United States was allowed to exceed the presumptive limit of ten depositions. In *TransCapital Leasing Associates 1990-II L.P.*, the United States deposed 14 fact witnesses, all of whom testified at trial. Plaintiffs' counsel in *TransCapital Leasing Associates 1990-II L.P*, who is also plaintiffs' counsel in the case at bar, did not oppose the Government's request to exceed ten depositions there. Plaintiffs' counsel in

*TransCapital Leasing Associates 1992-VIII, L.P.*, who is also plaintiffs' counsel in the case at bar, did oppose the Government's request to exceed ten depositions there, but the court granted it. Given the intricate facts and numerous individuals involved in the design, development, marketing, or implementation of this generic tax product, the additional discovery that the United States is seeking in this case is both necessary and clearly justified. The failure to grant the United States permission to take these depositions will prejudice its ability to fully and adequately present its contentions in this case.

In sum, the discovery the United States seeks from the witnesses listed in Exhibit I is not duplicative or cumulative, or obtainable from another source. Rather, it is necessary to provide full record of the transactions at issue, and provide the "other side of the story." The United States is entitled to this discovery not only to rebut the claims of plaintiffs, but also to obtain relevant information to complete the record that only these *direct* participants in the design and execution of the transactions at issue can provide.

**B. The United States Has Not Yet Had an Opportunity to Discover the Information Sought**

To date, the United States has deposed four individuals, three from TransCapital Corporation and one officer from Plains National Bank. In its initial disclosures under RCFC 26(a), plaintiffs identified each of these individuals as having information that it would use to support its claims in this case. The United States has not yet had the opportunity to obtain the testimony it seeks from the other witnesses listed in Exhibit I. And certainly the plaintiffs do not suggest that these four depositions have provided the information the United States seeks to discover from the witnesses listed in Exhibit I.

For the past several months the United States has been reviewing the documents from plaintiffs and third parties. This process has been time consuming. Last week the United States sent via facsimile a letter to opposing counsel, requesting plaintiffs to produce documents referred to by Jeff Isom in his April 20, 2007, deposition, but not previously produced, and to supplement or amend the privilege log attached to Plaintiffs' Initial Disclosures and the privilege log attached to Plaintiffs' Objections and Responses to Defendant's First Request for Production of Documents. Since plaintiffs have refused to agree to extend the discovery deadline in this case, the United States has asked opposing counsel to provide the requested documents and amended or supplemental privilege logs by Friday, May 4, 2007.

While the United States has obtained substantial amounts of discovery in the way of document production, it is also necessary to take testimony of the witnesses listed on Exhibit I – after all, contrary to the popular legal maxim, documents do not exactly "speak for themselves." These witnesses should be able to explain the most important documents produced, as well as testify about matters not contained in the documents, including communications with the other parties involved in the transactions. They may also contradict the representations in some of the documents created for purposes of the shelter.

The United States has no intention of taking unnecessary or duplicative depositions. Because of the number of individuals directly involved, however, and the fact that each witness played a separate and distinct role in developing and implementing the transactions at issue, the United States will not have an opportunity to discover the complete, true story of these shelter transactions within the presumptive ten deposition limit.

### C. The Importance of the Issues, Needs of this Case, the Amount in Controversy and the Importance of the Discovery Outweigh Any Possible Burden

As noted above, Plains National Bank for a participation fee of $1,187,218 claimed $11,081,288 of permanent tax losses (a 9 to 1 tax write off) in years 1994 through 2000 and more than $3,700,000 in tax savings.[13] The United States is committed to fully examining this shelter and ensuring the proper, and fair, application of the tax laws to the deductions they claimed in years 1994 through 2000.

Other taxpayers[14] also used the same, or similar "lease strip" tax shelter. On October 30, 1995, the Internal Revenue Service announced in Notice 95-53, 1995-2 C.B. 334, modified and superseded by Notice 2003-55, 2003-2 C.B. 395, that it would challenge lease stripping transactions by applying a variety of theories on a case-by-case basis. In Notice 95-53, the Service discusses "lease strips" and the tax consequences of these transactions and its intention to issue prospective regulations to address these transactions. The Notice defines a "lease strip" as a multiple party transaction intended to allow one party to realize rental income or other income from property or service contracts and to allow another party to report deductions related to that income.

---

[13]Plaintiffs acknowledge in the Joint Preliminary Status Report (at 6) that they received no release rentals from the leasehold positions transaction. Release proceeds are based on the appraisal of the equipment and generated only if the equipment is released or sold after the initial lease term. However, according to the Transcapital's marketing proposal, no potential proceeds could be realized from the release of the Bull equipment until January 1998, more than three years after the purported September 30, 1994, closing date and from the release of the Unisys equipment until February 1999, nearly four and half years after the closing date. In any event, the investor (Plains National Bank) would receive only 90% of the renewal rents generated by the leasehold positions after remarketing fees and adjustment for the 1% minority interest in the partnership (TCLA 1994-I).

[14]*See* the Joint Preliminary Status Report (at 12).

The leasehold positions transaction at issue is a lease strip transaction because it was designed to allow a tax neutral party, the Iowa Tribe of Oklahoma, to realize rental income and a taxable party, the Plains Capital Corporation consolidated group, to report the deductions related to that income. Later, the IRS made a global settlement offer to participants in the shelter. However, plaintiffs did not accept the settlement offer.

The importance of the issues presented in this case, both for this case and the proper application of the tax law, therefore, cannot be underestimated. To fully and fairly present its case here, the United States must take discovery that bears on the issues of economic substance, and the other tax law doctrines that overlay the application of the Code to any set of facts. This includes the discovery described above, and in Exhibit I.

## III. <u>THE DISCOVERY DEADLINE SHOULD BE EXTENDED</u>

During the June 26, 2006, telephonic Status Conference, the United States advised the Court of the need for more than ten depositions and the need for 18-24 months to conduct discovery. Plaintiffs opposed these requests and they were denied. In the April 4, 2007 telephonic Status Conference, the United States again advised the Court of the need to exceed ten depositions and to extend the June 25, 2007, discovery deadline. The United States also suggested that expert reports would be more meaningful to the Court if the experts could consider the deposition testimony of all fact witnesses *before* issuing their reports and therefore that the discovery deadline needed to be extended. Plaintiffs again opposed these requests and they were denied. However, the Court did advise United States that if it needed more than 10 depositions, to file a motion.

In denying the United States' second request to extend the discovery deadline in the April 4, 2007, telephonic Status Conference, the Court suggested that the United States had gotten a late

start on conducting discovery. That is not the case, however. The parties made initial disclosures in August 2006. The United States responded to interrogatories and requests for production of documents from plaintiffs in September 2006. Plaintiffs responded to United States' interrogatories and requests for production of documents in November 2006. The United States sent document subpoenas to numerous third-parties[15] in November 2006. However, the third-parties failed to respond to document subpoenas until late January 2007, more than two months after they were issued. While some produced numerous documents, many of the third parties produced no documents. The United States promptly began organizing and reviewing the documents produced, which has been time consuming. The United States also promptly provided copies of the documents produced to plaintiffs. As the Court knows, document production and review precedes meaningful depositions.[16] The United States provided a privilege log and produced additional documents from the IRS administrative filed to plaintiffs in February 2007. The United States sent a letter to plaintiffs suggesting potential dates for depositions of eight fact witnesses in the first week of March 2007. The United States also sent letter to counsel for third party witnesses suggesting potential dates for depositions in the first week of March 2007. Four of

[15] These third parties included TransCapital Corporation, TransCapital Management Corporation, TransCapital Computer Corporation, TAC I, Inc., TransCapital Management Associates Limited Partnership XII, TransCapital Leasing Associates Limited Partnership 1994-I, TransCapital Leasing Associates Limited Partnership 1992-IX, Aardan Leasing Corporation, Mithril Corporation, First Florida Leasing Corporation, Okoma Enterprises L.P., Pending One Corp, Capital Asset Partners, Stamford Leasing Associates, Equilease Corporation, and Equitable Leasing Company.

[16] Despite the Government's familiarity with the structure from other cases, it still has to conduct discovery so that it can admit evidence under the Federal Rules of Evidence.

those depositions were taken in April 2007. Just this week, the United States was able to schedule two more depositions for May 14-15, 2007.

The United States has identified at least 16 more fact witnesses it needs to depose for trial preparation, excluding expert witnesses designated by plaintiffs.[17] The Government, as a stranger to these transactions, must attempt to unravel and understand them through depositions of the individuals who were directly involved. On the other hand, plaintiffs, who were involved in, and therefore familiar with, the transactions, have not taken any depositions.

Because of the time it has taken for third-parties to produce the relevant documents and the number of depositions that still need to be taken and the additional third party subpoenas that need to be issued, the discovery Deadline in this case should be extended. The depositions yet to be taken include not only the witnesses from TransCapital Corporation, the promoter of the shelter, but also representatives of the other parties involved in the transactions that are listed on Exhibit G.

To accommodate the significant discovery which needs to be completed, the United States requests that the deadline be extended by three months[18]. This will allow time for plaintiffs to respond to the United States recent document production and for the United States to issue further third party subpoenas for documents that were not produced in response to the first subpoenas, and the parties to take the depositions in an orderly and logical progression.

---

[17] On April 30, 2007, the parties, by agreement, exchanged designation of experts in this case. Plaintiffs designated two expert witnesses and the United States designated three expert witnesses

[18] Plaintiffs agreed to a thirty day extension in the last Joint Status Report filed with the Court on March 26, 2007.

## Conclusion

For all the above reasons, the United States requests that the Court enlarge the presumptive deposition limit and allow it to take an additional twelve depositions, for a total of twenty-two.[19] The United States also requests that the Court enlarge the discovery deadline by four months.

Respectfully submitted,

/s/ Waymon G. DuBose, Jr.
WAYMON G. DuBOSE, JR.
Attorney of record
Tax Division
U. S. Department of Justice
717 N. Harwood, Suite 400
Dallas, Texas 75201
(214) 880-9721 (Main)
(214) 880-9741 (facsimile)

EILEEN J. O'CONNOR
Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims
JON E. FISHER
DAVID B. COFFIN
DAVID R. HOUSE
Of Counsel

[19] Two of these depositions would be of plaintiffs' expert witnesses.

CERTIFICATE OF CONFERENCE

I hereby certify that on April 27 and May 4, 2007, I contacted Tara Campbell, an attorney of record for plaintiffs, regarding the foregoing Motion of United States for Leave to Exceed Ten Depositions and Extend the Discovery Deadline. Ms Campbell advised that plaintiffs opposed the Motion.

/s/ Waymon G. DuBose, Jr.
WAYMON G. DuBOSE, JR.

CERTIFICATE OF SERVICE

I hereby certify that on May 4, 2007, I caused a copy of the foregoing Motion of United States For Leave to Exceed Ten Depositions and Extend the Discovery Deadline to be electronically filed with the Clerk of the Court using the CM/ECF system. I also certify that on May 4, 2007, I have sent this filing by U.S. Mail, postage prepaid, to plaintiffs, as follows:

M. Todd Welty
Tara Campbell
Meadows, Collier, Reed,
Cousins and Blau L.L.P.
901 Main Street, Suite 3700
Dallas Texas 75202

/s/ Waymon G. DuBose, Jr.
WAYMON G. DuBOSE, JR.